SPENCER KELLOGG & SONS, INC., Respondent, *v.* DELAWARE, LACKAWANNA AND WESTERN RAILROAD COMPANY, Appellant.

Fourth Department, December 22, 1922.

Carriers — action by grain elevator company to recover elevator charges from railroad which collected from shipper — carrier's tariff provided that charge would be retained wholly by elevator company — prior to taking effect of tariff elevator company agreed until notice not to give any part of charge to owners of grain — elevator company reduced charge below that in carrier's tariff and notified carrier — carrier continued to collect old rate — elevator company paid forwarding agents representing owners of grain commission for business — payment by carrier of charges collected with knowledge that elevator company would remit part to grain owners was not violation of Interstate Commerce Act, § 2, against rebating.

The payment by a carrier to a grain elevator company of the legal rate fixed by the carrier's tariff for elevation charges, with knowledge that the elevator company has paid forwarding agents representing the owners of grain commissions for furnishing grain to the elevator company for shipment over the carrier's railroad for export, does not constitute a violation of section 2 of the Interstate Commerce Act against rebating.

Accordingly, in an action by an elevator company against the carrier to recover elevation charges fixed by the carrier's tariffs, which were consented to by the elevator company, the carrier cannot successfully defend on the ground that if it pays the full amount of the tariff it will be guilty of a violation of section 2 of the Interstate Commerce Act, where it appears that the elevator company agreed not to divide elevation charges with the owners of grain, but reserved the right to cancel that agreement on written notice; that thereafter the carrier filed its tariffs, which were consented to by the elevator company, in which it was provided that elevation charges paid to an elevator company should be retained wholly by the company, and that thereafter the elevator company canceled its agreement and notified the carrier that it had reduced its elevation charges and that in the event the carrier collected any greater amount it would claim the right to receive from the carrier the excess over its reduced charges and to return the surplus to the owners of the grain transferred through its elevator.

Under the circumstances the elevating service was not performed by the carrier within the meaning of the Interstate Commerce Act or by any agent for which it was responsible, and, therefore, the violation of the provision of the tariff to the effect that the elevator company would retain the entire sum received from the carrier did not constitute a violation of the statute on the part of the carrier, even if it paid the elevator company the elevating charges out of the total transportation charges as specified in the tariff schedule, with notice of the payment by the elevator company to the forwarding agents.

APPEAL by the defendant, Delaware, Lackawanna and Western Railroad Company, from a judgment of the Supreme Court in favor of the plaintiff, entered in the office of the clerk of the county of Erie on the 7th day of August, 1922, upon the verdict of a jury rendered by direction of the court.

*Louis L. Babcock*, for the appellant.

*William C. Carroll*, for the respondent.

SEARS, J.:

The plaintiff owns and operates a grain elevator in the city of Buffalo. The defendant with certain other railroads and with the consent of the plaintiff and other elevator owners has filed a tariff schedule with the Interstate Commerce Commission providing for the freight charges on grain coming from vessels on the Great Lakes and relating to the transportation services (including receiving and delivering) from the time the grain leaves the lake vessel until it reaches the seaboard. The tariff, effective June 1, 1920, provided as follows: " The rates named herein include a charge of not exceeding one cent per bushel made by the Buffalo, Erie or Oswego elevators, against the grain for elevation and transfer from lake vessels to cars, and five days' storage; said charge to be retained wholly by such elevator companies as compensation for services performed."

The schedule also set forth that the rate was applicable to the plaintiff's elevator as well as to a number of others at Buffalo. Previous to the filing of this schedule other tariffs of a similar character had been effective, and several years before the parties had had a correspondence in the course of which on May 16, 1916, the defendant wrote to the plaintiff a letter containing the following:

" Question having arisen in regard to preserving the integrity of our tariffs covering rates on ex-lake Grain, due to the inclusion in the rate of one-half cent per bushel allowed your elevator for elevation (including five days storage), it seems essentially necessary if we are to continue to publish these rates that we should receive satisfactory assurance from you that no part of such compensation shall, either directly or indirectly, be used to influence the movement of any grain through your elevator.    *   *   *

" Will therefore be very glad to have you advise if you are prepared to subscribe to an understanding as indicated, it being understood that should you desire to withdraw your concurrence, sufficient notice will be given us to properly amend our tariffs, thus placing the elevators that do not care to be specified in our publications to an F. O. B. basis of rates."

To this the plaintiff responded on May 19, 1916, as follows: " In order to avoid any trouble we will agree that the one-half cent elevation charge you pay to us for the shipper, we will retain and will not give any part of the same to anyone having ownership interest in the grain. It is understood that the above is subject

to cancellation upon written notice by us to the Lackawanna Railroad."

Except for an increase from one-half to one cent for elevator charges the conditions remained the same until August 16, 1921, when the plaintiff wrote to the agent of the Eastern Freight Tariff Bureau, representing the railroads, as follows:

"We wish to advise you that on and after September 1, 1921, the charge for elevation and transfer from lake vessel to the cars and five days storage, to be made by the Kellogg Elevator will be one-quarter cent per bushel.

"We would ask that you arrange your Tariff Supplement No. 13 ICC-A-125 be amended to state such fact."

On September 6, 1921, the plaintiff also wrote to the defendant as follows:

"  *   *   *   we wish to state:

"1. That the Kellogg Elevator reaffirms its right to establish its rate for elevation and storage and to exact from all shippers using the services of the Kellogg Elevator its established rate.

"2. To advise the Grain trade of its established rate to be exacted for the services to be performed.

"3. In the event the railroads exact the amount set forth in their existing tariff schedules, or any amount greater than that established by the Kellogg Elevator for its services, to receive from the railroads the full amount so received from the shipper and to return to him the surplus over and above its rate as an overcharge.

"4. To retain its position where it will be entitled to compete, and will compete, for the business of elevation with the other elevators at the City of Buffalo, and establish its rates for the service of elevation irrespective of any rates which the railroads or the other elevators, or either or all of them, may seek to establish."

The schedules on file when these letters were sent were not amended by the railroad.

It appeared upon the trial that the plaintiff had solicited the business of elevating and storing grain from the forwarding agents representing the owners, and that the plaintiff during the months of September and October, 1921, paid the sum of $695.59 to such forwarding agents as a commission for furnishing grain to the plaintiff's elevator for shipment over defendant's railroad for export. It also appeared that during these months the plaintiff elevated from lake vessels and delivered to the defendant 153,559 bushels of grain, the charge for elevating which, at one cent per bushel, amounted to $1,535.59. Both parties concede the tariff rate for elevating to be one cent per bushel. The freight rates upon all

this grain were collected by the defendant including, of course, the rate for elevating as specified in the tariff, but the defendant has refused to pay this sum to the plaintiff upon the theory that by so doing it would be guilty of rebating in violation of the provisions of section 2 of the Interstate Commerce Act: "That if any common carrier subject to the provisions of this Act shall, directly or indirectly, by any special rate, rebate, drawback or other device, charge, demand, collect or receive from any person or persons a greater or less compensation for any service rendered, or to be rendered, * * * than it charges, demands, collects or receives from any other person or persons for doing for him or them a like and contemporaneous service * * * such common carrier shall be deemed guilty of unjust discrimination, which is hereby prohibited and declared to be unlawful." (24 U. S. Stat. at Large, 379, § 2, as amd. by Transportation Act, 1920 [41 id. 479], § 404.)

It is for this sum of $1,535.59 that the plaintiff has brought this action and recovered judgment.

Certain legal principles applicable to this case are established. The rates for elevating grain at such warehouses as the plaintiff's are subject to regulation by statute as a public service. (*Munn* v. *Illinois,* 94 U. S. 113; *People* v. *Budd,* 117 N. Y. 1; affd., 143 U. S. 517.) In the absence, however, of such statutory regulation, elevator owners may compete freely and establish such rates for their services as they see fit. Although an elevator is not a common carrier, yet when elevating service is rendered by a railroad in connection with transportation, such elevating service is by Federal statute made a part of transportation so as to be subject to regulation by the Interstate Commerce Commission. "The long mooted question as to whether elevation was such a part of transportation as to bring it within the jurisdiction of the Interstate Commerce Commission was answered by the act of June 29, 1906, 34 Stat. L. 584, 590, c. 3591,* in which Congress declared that 'the term "transportation" shall include * * * all * * * facilities of shipment, * * * irrespective of ownership, * * * and all services in connection with the * * * elevation, and transfer in transit * * * and handling of property transported.'" (*Union Pacific Railroad* v. *Updike Grain Co.,* 222 U. S. 215.)

We may assume also that the payment of commissions to a

---

* See Interstate Commerce Act (24 U. S. Stat. at Large, 379), § 1, as amd. by 34 id. 584, § 1; amd. by 36 id. 544, 545, § 7, and Transportation Act, 1920 (41 id. 474, 475), § 400; Interstate Commerce Act (24 id. 384), § 15, as amd. by 34 id. 589, 590, § 4; amd. by 36 id. 551, 553, § 12, and Transportation Act, 1920 (41 id. 484, 488), §§ 418, 421.— [REP.

forwarding agent representing the owners of the grain gave to the owners of the grain a special rate, rebate or drawback so far as the cost of elevation to the owner of the grain was concerned. (*United States* v. *Lehigh Valley R. R. Co.*, 222 Fed. Rep. 685.)

The plaintiff in making payments to the forwarding agents violated the provisions of the tariff schedule to which it had consented. It did not violate the promise in its letter of May 19, 1916, for the promise contained in the letter standing alone was conditional, and after notice was given ceased to be binding upon it. No contract obligation resting on the correspondence of 1916 was violated by the plaintiff.

It is not necessary to consider whether by consenting to the filing of the tariff the plaintiff became amenable to the penalties imposed by the statute upon common carriers for rebating.

The defendant contends that it would itself be guilty of the discrimination resulting from the payment of commissions to the forwarding agents if the defendant paid to the plaintiff the elevating charges out of the freight which the defendant has collected; in other words, that the defendant would indirectly be receiving from the shippers less compensation for services rendered than it received from other persons for a like and contemporaneous service. If the service of elevating the grain had been rendered by the railroad itself or by an agent for whose acts it was responsible, this would probably be the case. But here we have a situation where this terminal facility was rendered not by the carrier but by an independent corporation engaged in a business enterprise which it could carry on without filing rates under the Interstate Commerce Act. Under such circumstances, the elevating service was not rendered by the railroad company within the meaning of the Interstate Commerce Act or by any agent for which it was responsible, and, therefore, the violation of the provision of the tariff to the effect that the plaintiff would retain the entire sum received from the railroad, would not constitute a violation of the statute *on the part of the railroad* even if the railroad paid the plaintiff the elevating charges out of the total transportation charges as specified in the tariff schedule with notice of the payment by the plaintiff to the forwarding agents. The tariff provides that the elevating company is to receive the elevating charge and the defendant cannot be criticized for complying with this provision of the tariff, provided, of course, it had not been instrumental in inducing or assisting in the plaintiff's discriminatory acts. (*Tracy* v. *Talmage*, 14 N. Y. 162; *Mechanics Ins. Co.* v. *Hoover Distilling Co.*, 182 Fed. Rep. 590.)

While as a whole the plaintiff's conduct did result in favoritism

and inequality, the favoritism and inequality existed solely by reason of the conduct of an independent business not in and of itself within the scope of the section forbidding rebating. That an easy method will thus be afforded common carriers of evading the provisions of the statute may be a ground for further legislation but does not affect the general principles applicable to this situation.

The judgment appealed from should be affirmed, with costs.

All concur.

Judgment affirmed, with costs.